IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ALFREDO PRIETO,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )     1:12cv1199 (LMB/IDD)
                                   )
HAROLD C. CLARKE, et al.,          )
                                   )
          Defendants.              )

NOV 1 2 2013

MEMORANDUM OPINION

     Before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, Plaintiff's Motion for Summary Judgment will be granted and the Motion for Summary Judgment by defendants will be denied.

I.     BACKGROUND

     Alfredo Prieto ("Prieto" or "plaintiff") is an inmate at Sussex I State Prison ("SISP") in Waverly, Virginia, awaiting execution for two capital murder convictions.  Like all capital offenders in Virginia,[1] plaintiff is confined in a separate housing unit commonly known as "death row."  He has been there since October 30, 2008.  See Defs.' Mem. in Supp. [hereinafter Defs.' Mem.], Ex. 1, ¶ 4.

---

[1] As of October 2013, plaintiff was one of only eight capital offenders in the state, all of whom are housed at SISP.  See Pl.'s Mem. in Supp. of Summ. J. [hereinafter Pl.'s Mem.], Ex. 19, at 75:9–10.

Conditions on death row are more restrictive than incarceration in the general population housing units at SISP, which is a maximum-security facility.  The former amount to a form of solitary confinement:  On average, plaintiff must remain in his single cell for all but one hour of the day.  See Pl.'s Mem., Ex. 27 ("Virginia Department of Corrections, Operating Procedure 460.A"); see also id. at Ex. 1, at 91:1-15.  That cell measures 71 square feet, id. at Ex. 16, at 4, and features only a narrow, mesh-covered window for natural light.  It is otherwise illuminated by a main light mounted on the wall.  In the evening hours, when the main light is turned off, a nightlight remains on in plaintiff's cell, as do the pod lights immediately outside of it, ensuring that his cell is never completely dark.  See id. at Ex. 15, at 57:14-58:7.  Plaintiff is allowed to leave his cell for just one hour of outdoor recreation approximately five days per week.  Id. at Ex. 27, at 6.  During that time, however, he is limited to a similarly-sized outdoor cell with a concrete floor and no exercise equipment.  See id. at Ex. 1, at 92:1-19.  Plaintiff is not allowed to use the gymnasium or prison yard, nor is he given an opportunity for in-pod recreation.  See id. at Ex. 1, at 91:1-25.  Plaintiff may leave his cell for a ten-minute shower three days per week.  Id. at Ex. 27, at 7.  He may also purchase a

2

television and compact disc player for use in his cell, as well as request delivery of certain books from the law library.  See Defs.' Mem., Ex. 1, ¶¶ 11-12.

Perhaps the most significant restrictions are those depriving plaintiff of human contact.  He must spend almost all of his time alone.  Although death row houses seven other inmates, they are separated by at least two (and often many more) empty cells within the 44-unit pod.  See Pl.'s Mem., Ex. 15, at 69:8-24.  Solid metal doors with no openings apart from small slits substantially impede any communication among death row inmates.  See id. at Ex. 26 (Photograph of Cell Interior). In addition, plaintiff takes all three daily meals in his cell. Id. at Ex. 27, at 4.  Visitation opportunities are limited to non-contact visits from immediate family members on weekends in a room with a glass partition, id. at Ex. 27, at 7, though in actuality no one ever comes, id. at Ex. 15, at 107:20-108:2. Thus, plaintiff's only regular source of human contact is prison officials, including those tasked with administering medical and mental health services in his cell.  He is not allowed to join general population inmates for vocational, educational, or behavioral programming, nor is he allowed to attend group religious services.  See id. at Ex. 1, at 91:3-15.

3

Capital offenders are automatically and permanently placed in such restrictive conditions as a matter of policy -- contrary to the practice for all other inmates in Virginia. Upon entering the prison system, the latter are assigned an initial security classification between level one (minimum risk) and level five (maximum risk) by the Virginia Department of Corrections ("VDOC").[2] See id. at Ex. 3, at 30:11-20. This classification is based on eight distinct factors, including an individual's history of institutional violence, history of escape attempts, and "other stability factors."[3] See id. at Ex. 7 ("Virginia Department of Corrections, Operating Procedure 830.2, Attachment 1"). Numerical values are attached to each factor, the sum of which is the score used to determine the level of risk. See id. at Ex. 2 ("Virginia Department of Corrections, Operating Procedure 830.2"); see also id. at Ex. 3, at 44:18-25 (describing the initial classification score as the "primary" determinant of an inmate's risk level). Non-capital

---

[2] An additional security level -- known as level "S" -- exists for certain inmates assigned to a segregated housing unit within a level-five facility. See Pl.'s Mem., Ex. 1, at 46:18-25.

[3] The factors are published in the VDOC's "Scoring Guide" for the "Initial Offender Security Level Classification." They are as follows: (1) history of institutional violence, (2) severity of current offense, (3) prior offense history severity, (4) escape history, (5) length of time remaining to serve, (6) current age, (7) prior felony convictions, and (8) other stability factors. Pl.'s Mem., Ex. 7.

offenders are then placed in facilities commensurate with the risk they present, though VDOC officials retain some override authority in exceptional circumstances. See id. at Ex. 2, at 5. These placements are subject to modification at any time for a number of reasons. See id. at Ex. 2, at 6. In addition, the VDOC conducts a classification review for each inmate on an annual basis, providing an opportunity to move to a lower security level. See id. at Ex. 8 ("Virginia Department of Corrections, Operating Procedure 830.1").

Capital offenders, by contrast, receive no such initial security classification. Instead, based on sentence alone, they are automatically placed in restrictive conditions on death row at SISP. Id. at Ex. 2, at 5 ("Any offender sentenced to Death will be assigned directly to Death Row . . . ."). Only a nominal classification is prepared for purposes of the prison computer system, yielding a final score of "99" -- an arbitrary value signifying an offender's capital status -- which corresponds to security level "X." Id. at Ex. 2, at 5; id. at Ex. 3, at 59:5-15. Capital offenders are never brought to a reception center, nor are they evaluated using the multi-factor scoring guide. See id. at Ex. 3, at 57:15-25. Thus, their sentence conclusively determines their placement. Once a capital offender arrives on death row, he remains there for as

long as it takes to carry out his sentence, see id. at Ex. 2, at 5, in most cases more than six years. Capital offenders are ineligible for any subsequent classification review by the VDOC. Id. at Ex. 2, at 5 ("No reclassification will be completed."). In other words, their placement is permanent. The only exception is for a capital offender whose sentence is commuted or whose conviction is overturned, at which point he is reclassified pursuant to the usual review process. Defs.' Answer, ¶ 5.

On October 24, 2012, plaintiff, initially proceeding pro se, brought a civil action under 42 U.S.C. § 1983 challenging his placement and continued confinement in the restrictive conditions on death row. See Compl. He named as defendants Harold C. Clarke, the Director of the VDOC, David Robinson, the Chief of Corrections Operations for the VDOC, and Eddie L. Pearson, the Chief Warden at SISP (collectively, "defendants").

Plaintiff's complaint made two particular allegations. First, he claimed that SISP's visitation policies, which prohibit virtually all contact visits for death row inmates, violated his rights under the Eighth Amendment. Second, he claimed that his automatic and permanent placement in the restrictive conditions of confinement prevailing on death row violated his rights under the Due Process Clause of the

Fourteenth Amendment.  Accordingly, plaintiff sought a declaration that defendants must provide him with additional outdoor recreation opportunities and an appropriate program for inmates not facing disciplinary measures.

On November 2, 2012, the Court issued a Memorandum Opinion and Order dismissing plaintiff's Eighth Amendment claim pursuant to 28 U.S.C. § 1915A(b)(1).  See Mem. Op. & Order.  Plaintiff appealed but ultimately failed to prosecute, resulting in a dismissal of the proceeding.  See Prieto v. Clarke, No. 12-8025 (4th Cir. Feb. 6, 2013).  Only his due process claim remains before the Court at this point in the litigation.

On January 25, 2013, defendants filed a Motion for Summary Judgment with respect to the remaining claim.  Plaintiff, represented by pro bono counsel, opposed the motion as premature because he had not been given an opportunity to conduct discovery.  Pl.'s Mem. Opposing Summ. J. & Requesting Disc. Pursuant to Fed. R. Civ. P. 56(d).  The Court agreed with plaintiff, and issued an Order denying defendants' motion without prejudice.  Order of Feb. 20, 2013.  The parties then proceeded to conduct extensive discovery.

At the close of discovery, the parties filed the instant cross-motions for summary judgment.  Pl.'s Mot. for Summ. J.; Defs.' Mot. for Summ. J.  In support of his motion, plaintiff

argues that he has a constitutionally protected liberty interest in avoiding permanent assignment to his present conditions of confinement on death row. Plaintiff further argues that he was deprived of his liberty interest by the VDOC's automatic assignment process, which did not afford him notice of the reasons for his assignment or an opportunity to contest it. Accordingly, plaintiff seeks relief only in the form of an individualized classification determination using procedures that are the same or substantially similar to the procedures used for all non-capital offenders. He has indicated a belief that, if so classified, his score would render him eligible for assignment to a general population unit at a lower-security facility.

Conversely, in support of their cross-motion, defendants argue that the conditions in Virginia's death row are not sufficiently severe to implicate a protectable liberty interest in avoiding placement there. To the extent such an interest exists, defendants further argue that the existing classification system for capital offenders provides whatever minimal process may be due because plaintiff's interest in avoiding certain onerous conditions is dwarfed by defendants' interest in safe and efficient penal administration.

8

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the record in the light most favorable to the nonmoving party, and must draw all reasonable inferences in its favor as well, see Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002); however, "the mere existence of a scintilla of evidence in support of" the nonmoving party's position is insufficient, Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008). Accordingly, to survive a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (citation omitted).

9

### III.    DISCUSSION

The sole issue before the Court is whether plaintiff's automatic and permanent placement in the restrictive conditions of confinement prevailing in Virginia's death row violates his Fourteenth Amendment due process rights.  The analysis proceeds in two parts, looking first at whether a liberty interest exists and then at whether plaintiff was deprived of that interest without sufficient procedural protections.

### A. Protectable Liberty Interest

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  It is well settled that due process protections extend to inmates seeking to avoid certain conditions of confinement, albeit in a circumscribed fashion, the contours of which the Supreme Court has defined in two seminal decisions.

In Sandin v. Conner, 515 U.S. 472 (1995), the Court considered whether an inmate's placement in disciplinary segregation for 30 days implicated a protectable liberty interest.  Id. at 486.  Focusing on the nature of the alleged deprivation, the Court held that no such interest arose for three reasons: the inmate's "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody";

the inmate's segregation "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction"; and the inmate's segregation did not "inevitably affect the duration of his sentence." Id. at 486-87.  The Court also explained that a limited liberty interest would arise in the event that an inmate's conditions "impose[] [an] atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Id. at 484.

The Court returned to the due process issue in Wilkinson v. Austin, 545 U.S. 209 (2005).  There, the Court considered whether an inmate's assignment to a maximum-security prison with "highly restrictive conditions" sufficed to create a liberty interest under the Sandin test.  Id. at 213.  The Court held that it did based in large measure on differences between the conditions at the maximum-security prison and "most [other] solitary confinement facilities." Id. at 224.  At the former, inmates were denied virtually all sensory and environmental stimuli, as well as many basic forms of human contact.  Id. at 214.  The Court then identified two additional factors:  "First is the duration.  Unlike the 30-day placement in Sandin, placement at [the maximum-security prison] is indefinite and, after an initial 30-day review, is reviewed just annually.  Second is that placement disqualifies an otherwise eligible

inmate for parole consideration." Id. at 224. "While any of these conditions standing alone might not be sufficient to create a liberty interest," the Court concluded, "taken together they impose an atypical and significant hardship within the correctional context." Id.

Together, Sandin and Wilkinson conclusively establish that segregated confinement can trigger due process protections in certain circumstances. These decisions further establish that "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves in relation to the ordinary incidents of prison life." Id. at 223 (internal quotation marks and citation omitted). Only conditions that constitute an "atypical and significant hardship" suffice. It is evident that this inquiry is necessarily context-dependent and demands fact-by-fact consideration. See, e.g., Farmer v. Kavanagh, 494 F. Supp. 2d 345, 356 (D. Md. 2007) ("Wilkinson does not set forth a checklist of factors, all of which must be present, to hold that a protected liberty interest . . . exists, but instead directs lower courts to consider the totality of circumstances in a given facility.").

By its terms, the "atypical and significant hardship" test requires courts to first "identify[] the baseline from which to measure what is atypical and significant in any particular prison system." Wilkinson, 545 U.S. at 223.  Although this threshold issue has caused considerable consternation in the circuit courts, see id. (acknowledging "the difficulty of locating the appropriate baseline" from which to measure but declining to "resolve the issue"), it is clear that the Fourth Circuit uses a facility's "general prison population" as the relevant baseline, see Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997).  Here, that means the Court must look to the general population units at SISP, where Prieto would presumptively be placed but for his automatic separation as a consequence of his death sentence.

The "atypical and significant hardship" test then requires courts to perform a comparison to determine whether an inmate's confinement deviates sufficiently from the baseline.  Consistent with this task, courts have considered whether the conditions in question are particularly extreme or restrictive, whether the duration of confinement is excessive or indefinite, whether an inmate's parole status is negatively affected, and whether an inmate's confinement in such conditions bears a rational relationship to legitimate penological interests.  See, e.g.,

13

Harden-Bey v. Rutter, 524 F.3d 789, 793 (6th Cir. 2008); Estate
of DiMarco v. Wyo. Dep't of Corrs., 473 F.3d 1334, 1342 (10th
Cir. 2007); Skinner v. Cunningham, 430 F.3d 483, 487 (1st Cir.
2005).  The Court will consider each of these factors in turn.

     Plaintiff's conditions of confinement on death row are
undeniably extreme and atypical of conditions in the general
population units at SISP.  He must remain alone in his cell for
nearly 23 hours per day.  See Pl.'s Mem., Ex. 1, at 91:1-15.
The lights never go out in his cell, although they are scaled
back during the overnight hours.  See id. at Ex. 15, at 57:14-
58:7.  Plaintiff is allowed just five hours of outdoor
recreation per week, id. at Ex. 27, at 6, and that time is spent
in another cell at best slightly larger than his living
quarters, id. at Ex. 1, at 92:1-19.  He otherwise has no ability
to catch a glimpse of the sky because the window in his cell is
a window in name only.  Id. at Ex. 26.  Nor can he pass the time
in the company of other inmates; plaintiff is deprived of most
forms of human contact.  See id. at Ex. 1, at 91:3-15.  His only
real break from the monotony owes to a television and compact
disc player in his cell and limited interactions with prison
officials.  Such dehumanizing conditions are eerily reminiscent
of those at the maximum-security prison in Wilkinson.  See 545
U.S. at 214.  More importantly, the conditions on death row are

14

a good deal more restrictive than those experienced by general
population inmates at SISP.

Conditions for the latter group -- the baseline from which
to measure in this instance -- differ in almost every meaningful
respect.  First, general population inmates spend substantial
time every day out of the confines of their cells.  For example,
they are given approximately 80 minutes of outdoor recreation
four or five days per week, and they have access to the open
prison yard, complete with a jogging track and basketball
courts.  See Pl.'s Mem., Ex. 15, at 28:24-29:18.  Second,
general population inmates enjoy the near-constant company of
others.  They receive additional "in-pod recreation" time,
during which they may socialize and play games together in a
common area.  See id. at Ex. 15, at 34:15-25.  This is to say
nothing of the benefits of two communal meals per day, regular
contact visits from family and friends, and group religious and
educational programming.  In other words, the experience for
general population inmates at SISP is hardly a solitary one.

Comparing these conditions to plaintiff's experience, see
Beverati, 120 F.3d at 504, leads the Court to conclude that the
conditions on death row are uniquely severe.  Whereas general
population inmates are subject to a difficult but ultimately
social existence, death row inmates like plaintiff are denied

15

all freedom of movement and most freedom to interact with others. There can be no dispute that "almost every aspect" of a death row inmate's life "is controlled and monitored." Wilkinson, 545 U.S. at 214. It is true that plaintiff is not deprived of all environmental and sensory stimuli or human contact. Cf. id. ("It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact."). He is allowed to have a television and compact disc player in his cell, and he may have certain books delivered from the law library. See Defs.' Mem., Ex. 1, ¶¶ 11-12. Plaintiff also has occasional contact with guards and other prison officials administering health services. But these rudimentary privileges do not mitigate the overwhelming fact of isolation -- plaintiff is left alone in a small cell for nearly every hour of every day.

The Court likewise finds it significant that plaintiff has already spent five years in this placement, and there is no end in sight. Plaintiff has not even begun federal post-conviction proceedings, which are likely to play out over the course of several years and further delay the carrying out of his sentence.[4] For all practical purposes, his placement "is for an

---

[4] Plaintiff filed a petition for a writ of habeas corpus in state court, which was denied by the Virginia Supreme Court on September 12, 2013. See Prieto v. Warden of the Sussex I State

indefinite period of time," just as in Wilkinson.  545 U.S. at 214-15.

The Court also finds it unreasonable that the VDOC refuses to afford plaintiff any classification review as a matter of policy in the meantime.  Pl.'s Mem., Ex. 2, at 5; cf. Wilkinson, 545 U.S. at 224 ("Unlike the 30-day placement in Sandin, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually.").  Defendants do not dispute this fact.  The VDOC's no-review policy guarantees that plaintiff will ultimately remain in his current conditions for a period of years.  See Defs.' Mem. 19 (noting that most death row inmates are confined for "between 6-9 years").  Thus, on its own, the excessive duration here weighs strongly in favor of finding that a cognizable liberty interest exists.  Cf. Marion v. Columbia Corr. Inst., 559 F.3d 693, 699 (7th Cir. 2009) ("[O]ther courts of appeals have held that periods of confinement that approach or exceed one year may trigger a cognizable liberty interest without any [specific] reference to conditions.").

Plaintiff's indefinite, long-term confinement in severe conditions is even more weighty when compared to the duration of confinement for general population inmates placed in

Prison, 748 S.E.2d 94 (Va. 2013).  Plaintiff has not yet pursued federal habeas relief.

17

administrative or disciplinary segregation.  All inmates at SISP

may be placed in segregation for an interval of time in which

they experience conditions virtually identical to those on death

row.  Pl.'s Mem., Ex. 6 ("Virginia Department of Corrections,

Operating Procedure 861.3"), at 12.  As such, occasional

confinement in restrictive conditions is an "ordinary incident

of prison life" at SISP.  See Wilkinson, 545 U.S. at 223.  The

important difference is that the length of that interval is

strictly limited for non-capital offenders.  Inmates "may be

assigned to Disciplinary Segregation for a maximum period of 30

days for each major rule violation."  Pl.'s Mem., Ex. 6, at 12.

In addition, those inmates receive a status review within 72

hours of arrival, and every 30 days thereafter in the event of

an extended placement for multiple violations.  See id., Ex. 15,

at 137:20-138:12.  By contrast, plaintiff has not been granted a

single review in five years, nor will he ever get one without a

change in policy.  While other inmates can be sure that they

will be considered for reassignment to a general population unit

on a defined scheduled, plaintiff has no such hope.  In the end,

he could go a decade or more without any opportunity to object

to his restrictive conditions of confinement or otherwise be

heard on the matter.

18

Finally, the Court finds that the nature of plaintiff's confinement furthers few, if any, legitimate penological goals. See DiMarco, 473 F.3d at 1342 (considering whether "the segregation relates to and furthers a legitimate penological interest"); Skinner, 430 F.3d at 486 (considering whether an inmate's segregation "was rational").  For starters, it bears no clear relationship to any of the valid punitive, protective, or investigative goals that justify temporarily placing general population inmates in similar conditions.  See Sandin, 515 U.S. at 485-86 (suggesting that most disciplinary segregation does not implicate a protectable liberty interest because discipline is to be expected in the prison context).  Plaintiff has been by all accounts a model prisoner.  Pl.'s Mem., Ex. 4, at 100:25-101:6; id. at Ex. 19, at 109:15-18.  He has not engaged in any of the behaviors that would normally support placement in segregated confinement.

Nor is plaintiff's confinement well calibrated to further legitimate safety- and resource-related goals.  The VDOC's policy toward death row inmates largely rests on two fundamental assumptions: first, that these inmates inherently present a greater risk to prison safety because they "have nothing to lose," and second, that they are less deserving of limited prison resources because they will never reenter society.  See,

19

e.g., id. at Ex. 1, at 93:5-13; id. at Ex. 4, at 63:19; Defs.'
Mem., Ex. 2, at 28:14-29:21.  Neither assumption finds much
support in the record.  Death row inmates have obvious
incentives to behave well and take rehabilitation seriously,
including the possibility that new forensic evidence might
undercut a conviction, a habeas petition might be granted, or
that good behavior might improve the prospects of a commuted
sentence.  See Pl.'s Mem., Ex. 1, at 76:9-21.

These assumptions are also inconsistent with VDOC
practices.  Compare the treatment of inmates sentenced to death
and those sentenced to life imprisonment without the possibility
of parole.  Although the VDOC's stated reasons for separating
death row inmates and denying them programming apply with equal
force to both classes, inmates serving life sentences are
presumptively assigned to the general population units at SISP,
where they may avail themselves of limited programming.  In any
event, the presence of legitimate safety concerns "does not
diminish" plaintiff's liberty interest in avoiding particularly
harsh conditions.  See Wilkinson, 545 U.S. at 224 ("OSP's harsh
conditions may well be necessary and appropriate in light of the
danger that high-risk inmates pose both to prison officials and
to other prisoners.  That necessity, however, does not diminish

our conclusion that the conditions give rise to a liberty interest in their avoidance." (citation omitted)).

For these reasons, the Court concludes that plaintiff's conditions of confinement "taken together [] impose an atypical and significant hardship within the correctional context." Wilkinson, 545 U.S. at 224.

Defendants contend that Sandin and Wilkinson dictate a different outcome here. They view those cases as establishing an exclusive list of three necessary factors that bear on the liberty interest analysis, see Defs.' Mem. 9, two of which have been discussed above -- the degree of restriction and duration. The third factor is whether placement in the challenged conditions of confinement "disqualifies an otherwise eligible inmate for parole consideration." Wilkinson, 545 U.S. at 224. Plaintiff clearly has not been eligible for parole at any point and therefore has not had his sentence lengthened by his current placement. But defendants are wrong to suggest that this factor standing alone is dispositive under Sandin and Wilkinson. The "atypical and significant hardship" test is not so rigid; rather, the Supreme Court indicated that lower courts ought to consider the cumulative effect of several relevant factors. See, e.g., Ramirez v. Galaza, 334 F.3d 850, 861 (9th Cir. 2003) (noting that the standard requires "case by case, fact by fact

consideration"); Farmer, 494 F. Supp. 2d at 356 (noting that Wilkinson "directs lower courts to consider the totality of circumstances in a given facility"). To read Sandin and Wilkinson any more narrowly would cabin those decisions to their facts. See Westefer v. Snyder, 422 F.3d 570, 590 (7th Cir. 2005) ("Illinois' contention that the liberty interest identified in Wilkinson turned exclusively on the absence of parole constitutes . . . far too crabbed a reading of the decision.").

Moreover, the appropriate baseline in this case is not the conditions at the Halawa Correctional Facility (Sandin) or the Ohio State Penitentiary (Wilkinson). To the contrary, plaintiff's conditions of confinement must be compared to the conditions experienced by general population inmates at SISP. Beverati, 120 F.3d at 504; see Wilkinson, 545 U.S. at 223 (describing the "touchstone of the inquiry" as "the nature of [the challenged] conditions themselves in relation to the ordinary incidents of prison life" (emphasis added)). On that score, the Court finds that the severity of the conditions on death row, the excessive duration of plaintiff's confinement in such conditions, and minimal legitimate penological justification outweigh the absence of negative parole effects, and impose an "atypical and significant hardship" on plaintiff.

22

Accordingly, plaintiff has a protectable liberty interest in avoiding his current placement.

### B. Process Due

Having found that a liberty interest exists, the next question is what process plaintiff is due before he may be placed in such conditions of confinement. Wilkinson, 545 U.S. at 224. It is important to bear in mind that plaintiff's constitutional rights are not violated by the imposition of the above-described hardship itself, but by the imposition of that hardship without sufficient procedural protections.

At this step in the analysis, the Court must employ the familiar framework established in Mathews v. Eldridge, 424 U.S. 319 (1976). See Wilkinson, 545 U.S. at 224-25. The Mathews framework provides three components for courts to consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. (quoting Mathews, 424 U.S. at 335).

In the prison context, the Supreme Court has further held that due process is satisfied by providing "notice of the factual basis" for an inmate's placement and "allowing the inmate a rebuttal opportunity." Id. at 226 (describing notice

23

and a fair opportunity to respond as "among the most important
procedural mechanisms for purposes of avoiding erroneous
deprivations").  This modest requirement -- "informal,
nonadversary procedures" -- reflects an inmate's "limited"
interest in avoiding erroneous placement in unusually
restrictive conditions and the state's "dominant" interest in
ensuring the safety of guards and inmates alike, maintaining
prison security, and preserving scarce resources.  Id. at 226-
27.

        Setting aside the parties' competing interests, the Court
finds that the VDOC's automatic placement policy for capital
offenders fails to provide even the most basic procedural
protections.  Plaintiff did not receive advance notice of the
factual basis leading to his placement in segregated
confinement, nor did he receive an opportunity to contest it.
Cf. id.  Instead, he was shuttled directly to death row at SISP,
bypassing the initial security classification process followed
for all other inmates (and its attendant safeguards).  See Pl.'s
Mem., Ex. 2, at 5 ("Any offender sentenced to Death will be
assigned directly to Death Row . . . .").  In other words,
plaintiff was afforded no before-the-fact process at all.
Defendants concede as much.  Defs.' Resp. to Pl.'s Mot. for
Summ. J. [hereinafter "Defs.' Resp."] 12 ("Plaintiff is

                              24

classified as a death row offender simply by the existence of a court order imposing the penalty of death."). The automatic nature of the VDOC's assignment policy in fact guarantees that prison officials have no ability to provide a reasoned explanation of placement decisions or discretion to consider an inmate's rebuttal.

Likewise, the permanent nature of that policy forecloses any after-the-fact process. Cf. Skinner, 430 F.3d at 486 ("Due process, even where it is due, does not invariably mean process before the fact."). Plaintiff has had no subsequent opportunity to contest his placement because classification review is not available to capital offenders on any basis. Pl.'s Mem., Ex. 2, at 5 ("No reclassification will be completed."). The aggregate effect is that plaintiff is deprived of safeguards against erroneous placement in conditions that are more restrictive than necessary by virtue of his sentence alone. He has no forum in which to argue that he belongs in conditions more akin to those experienced by general population inmates at his maximum-security facility. Clearly, defendants have not provided even "informal, nonadversary procedures" in this instance. See Wilkinson, 545 U.S. at 226-27. The Court therefore concludes that defendants have failed to comply with the demands of due process.

Defendants respond with a variety of counterarguments, none of which are persuasive.  First, it is no answer that plaintiff's conviction for a capital offense ensures that he is properly placed on death row.  See Defs.' Resp. 13 ("Given that the death sentenced offenders all are placed on death row, there is essentially no risk of error of an erroneous placement.  The order from the sentencing court either sentences the defendant to death or it does not.").  Defendants fail to distinguish among the multiple deprivations at play here.  Plaintiff undoubtedly received process in the Virginia state courts before he was removed from free society; he does not argue otherwise.  Instead, plaintiff challenges only the additional deprivation that occurred when he was placed in segregated confinement, a severe form of imprisonment usually reserved for problematic inmates or those with special needs.  Cf. Wilkinson, 545 U.S. at 225 ("Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all.").  For the latter deprivation, plaintiff has received no process at all pursuant to VDOC policy, as explained above.

It is similarly no answer to suggest that process in the form of classification review for plaintiff would be futile.

26

See Defs.' Resp. 12-13 (claiming that capital offenders would be assigned to the most restrictive conditions of confinement in any event).  There is no futility exception to the Due Process Clause.  Regardless of whether plaintiff would in fact be eligible for placement in less-restrictive conditions or a lower-security facility, it is the evaluative process itself that vindicates his constitutional rights.

The Court's limited ruling leaves defendants with multiple options going forward.  First, defendants could provide plaintiff with an individualized classification determination using procedures that are the same or substantially similar to the procedures used for all non-capital offenders, as plaintiff requests.  Doing so would likely comport with the minimal due process requirements described in Wilkinson.  545 U.S. at 226-27.  Second, defendants could vary the basic conditions of confinement on death row, if only slightly, such that confinement there would no longer impose an atypical and significant hardship on plaintiff.  Either way, the Court's ruling does not necessarily entail a wholesale shift in Virginia's penal policy.  The cost of compliance is limited by the very small class of affected inmates.

IV.  CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment will be granted and the Motion for Summary Judgment by defendants will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 12th day of November, 2013.


Alexandria, Virginia


/s/ _____

Leonie M. Brinkema
United States District Judge